**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division


JAQULINE M. FUTRELL,

Plaintiff,

v.                                                      ACTION NO. 4:13cv25

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

Defendant.


**UNITED STATES MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION**

Plaintiff brought this action under 42 U.S.C. § 405(g), seeking judicial review of the

decision of the Commissioner of the Social Security Administration ("Commissioner") that

denied Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under

Title II of the Social Security Act, as well as Plaintiff's claim for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act.

This action was referred to the undersigned United States Magistrate Judge pursuant to

the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil

Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern

District of Virginia, by order of reference, dated April 18, 2013.  This Court recommends that the

decision of the Commissioner be VACATED and the case be REMANDED for further

administrative proceedings.

## I. **PROCEDURAL BACKGROUND**

The plaintiff, Jacqueline Marlo Futrell ("Plaintiff" or "Futrell"), filed applications for SSI

and DIB on March 10, 2009, alleging she had been disabled since February 8, 2008. R. 246-255.[1] The application stemmed from congestive heart failure, herniated disc, asthma, hypertensive cardiovascular disease/hypertension, severe back pain, and depression. R. 302. The Commissioner denied Plaintiff's application, both initially on April 14, 2009, R. 160-72, and upon reconsideration on October 30, 2009. R. 177-83.

At Plaintiff's request, a hearing before an Administrative Law Judge ("ALJ") took place on July 21, 2010, where both the Plaintiff (who was represented by counsel) and an impartial vocational expert (VE) testified. R. 56-75. The ALJ released an opinion on July 27, 2010, finding Plaintiff not disabled and denying Plaintiff's claim. R. 135-53. Plaintiff requested review of the ALJ's decision by the Appeals Council on September 2, 2010. R. 201. The Appeals Council remanded Plaintiff's claim for further review on February 11, 2011, ordering the ALJ to give further consideration to Plaintiff's maximum residual functional capacity; further evaluate Plaintiff's subjective complaints; and, if warranted by the record, obtain supplemental evidence from a vocational expert. R. 154-57. A second hearing with the ALJ occurred on April 19, 2011, at which both the Plaintiff and a second VE testified. R. 30-55. On April 25, 2011, the ALJ issued a second decision, granting Plaintiff's claim of disability from October 30, 2010 onward, but denying her claim of disability prior to that date. R. 11-24. Plaintiff requested review of the ALJ's denial prior to October 30, 2010 on May 10, 2011 (R. 9-10) and on September 21, 2012, the Appeals Council denied Plaintiff's request to review the ALJ's decision, making the ALJ's decision the Commissioner's final decision for the purposes of judicial review. R. 1-8.

Having exhausted all administrative remedies, Plaintiff filed a complaint with this Court on November 26, 2012, ECF No. 1, and an amended complaint on December 5, 2012, ECF No.

---

[1] Page citations are to the administrative record previously filed by the Commissioner.

3.   On the same day she filed the amended complaint, Plaintiff also filed a motion to transfer venue from the Norfolk Division of the Eastern District of Virginia to the Newport News Division, ECF No. 4, which was granted on February 12, 2013, ECF No. 5.  Defendant filed an Answer to the Complaint on April 17, 2013. ECF No. 8. On April 19, 2013, an Order was entered directing the parties to file Motions for Summary Judgment. ECF No. 11. Plaintiff's Motion for Summary Judgment and Motion for Remand was submitted on May 2, 2013. ECF Nos. 12 & 13. Defendant Commissioner's Motion for Summary Judgment was filed on June 19, 2013. ECF No. 15. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision based on the memoranda.

## II. <u>FACTUAL BACKGROUND</u>

Plaintiff was born in 1958 and was fifty years old on the date when she alleges she was disabled. R. 247, 250. Plaintiff attended school through the eleventh grade, (R. 60), and her past work included working as a hospital cook from 1996-2005, as a laundry attendant from 2006-2007, and as fire watch at a local boatyard from 2007-2008. R. 46, 303, 309-12, 350. Plaintiff filed her application for DIB on March 10, 2009, alleging disability as of February 8, 2008, based on congestive heart failure, herniated disc, asthma, hypertensive cardiovascular disease/hypertension, severe back pain, and depression. R. 246-255, 302.

Plaintiff's alleged date of disability corresponds with her date of injury at her job at the boat dock, where she allegedly strained her back carrying a fire extinguisher up a set of steps.  R. 144, 420.  However, Plaintiff's medical history indicates she struggled with issues relating to her back and heart before the alleged onset date.

**A. Plaintiff's medical history prior to the alleged onset date of February 8, 2008**

According to Plaintiff's medical records, she underwent a left lumbar laminectomy, fusion, and removal of a benign L3-4 tumor in 2002, performed by neurosurgeon Richard B. McAdam, M.D.  R. 462-70.  Continued monitoring of the Plaintiff's condition post-surgery, including a March 2004 MRI and a September 2005 X-Ray, indicate that aside from slight changes consistent with hemilaminectomy and minor pain, the 2002 back surgery had no lasting effect on the Plaintiff in those years.  R. 367-70, 376-78.

Additionally, medical records from cardiologist Mark W. Clark, M.D., Plaintiff was also being followed for hypertension, deteriorating ventricular function, congestive heart failure, dilated cardiomyopathy, mild mitral regurgitation, trace pulmonic insufficiency, minor atherosclerotic coronary artery disease, dyspnea on exertion, and tobacco smoking during May of 2004.  R. 361, 365.  On May 28, 2004, Dr. Clark opined that Plaintiff's condition was stable, but stressed the importance of complying with treatment.  R. 365.  On November 18, 2004, Dr. Clark performed a follow-up visit, during which time he found that while Plaintiff's hypertension was controlled, an echocardiogram showed her ventricular function with left ventricular ejection fraction was at 30%, down from 36% in August 2003.  R. 362-64, 374.  An x-ray of Plaintiff's chest, performed by Curtis D. Stoldt, D.O., in September of 2005, was unremarkable.  R. 378.

On August 27, 2005, Plaintiff was examined by Tom Hill, M.D., at the request of the Virginia Department of Rehabilitative Services.  R. 372-376.  Dr. Hill opined that Plaintiff self-reported that she had a decreased ability to do household chores, including washing dishes, washing clothes and making her bed, requiring frequent breaks, because of her congestive heart failure.  R. 372.  Plaintiff also self-reported that she could walk close to a mile, could dress and feed herself, and could lift approximately ten pounds, but has dyspnea after climbing one set of

4

stairs. R. 372. Dr. Hill indicated that Plaintiff had no trouble getting on and off the examination table, getting into or out of a chair, and dressing and undressing herself for the examination. R. 373-74. On examination, Dr. Hill opined that Plaintiff's lungs were clear and heart was normal. R. 374. Her neurological exam was also unremarkable; she had normal gait and grip strength, normal range of motion bilaterally, and sensation bilaterally. R. 374. Her straight leg raising was negative. R. 374. Dr. Hill indicated that Plaintiff had no significant deficits in her musculoskeletal system, and only mild symptoms relating to congestive heart failure. R. 375.

On June 15, 2007, Plaintiff's primary care doctor, Charlotte Thornton, M.D., prescribed Prozac, an anti-depressant, following the death of Plaintiff's son. Plaintiff testified that she has not received any specialized mental health treatment. R. 65.

### B. Plaintiff's medical history between the alleged onset date of February 8, 2008, and the ALJ's previous decision

In February of 2008, Plaintiff alleges she strained her back carrying a fire extinguisher up steps at her work as fire watch on a boat dock.[2] R. 144, 420. She stopped working on February 8, 2008, and sought treatment from Larry Winder, M.D., who returned her to light duty work on February 17, 2008. R. 420. She only worked for three days on light duty before stopping again.[3] R. 420. On April 10, 2008, Plaintiff sought treatment for her back injury from Dr. McAdam, who had treated her previously for back surgery. R. 420-22.

At the April 10, 2008 appointment, Dr. McAdam noted Plaintiff's medical history as including heart disease, hypertension, asthma, status-post excision of spinal tumor at L3-4 in June 2002 with left transverse process fusion L3-4. R. 420. Dr. McAdam's examination revealed possible quadriceps weakness on the left, depressed but not absent left knee reflex,

---

[2] Plaintiff indicated to her physical therapy center that her job at the boatyard required her to lift and carry 40-55 pounds, climb in and out of tight spaces, climb ladders, twist, and squat. R. 394, 397.
[3] Plaintiff testified before the ALJ that she filed a Worker's Compensation claim regarding this injury, which she apparently settled for a lump sum in 2009. R. 36, 62.

reduced range of motion of the back in forward flexion, and L4 root stretch signs on the left.  R. 422.  Otherwise, his examination revealed normal gait, stable station, normal muscle tone with no atrophy, and normal and intact sensation.  R. 422.  Dr. McAdam indicated that these findings and Plaintiff's back and leg pain suggested L4 root compression, and he recommended an MRI scan.  R. 422.

On April 21, 2008, Plaintiff received an MRI of the lumbar spine.  R. 481.  It indicated L5-S1 mild left facet hypertrophy, L4-5 mild diffuse disc protrusion, and L3-4 postoperative changes with mild to moderate left disc protrusion.  R. 481.  On April 25, 2008, Plaintiff met again with Dr. McAdam, who indicated that her examination remained unchanged.  R. 419.  He indicated his impression of the MRI was lumbar herniated nucleus pulposus at L3-4 with radiculopathy in the lower extremity.  He recommended an epidural steroid injection as a first step, indicating she may eventually need surgery.  R. 419.  He also opined that she would be out of work for three months while her management was being worked out.  R. 419.

Plaintiff saw Dr. Thornton regarding pain management of her back injury on May 12, 2008.  R. 450.  Plaintiff reported back pain, and was given Tylenol #3.  R. 450.  On May 15, Dr. Thornton wrote her a prescription for the Tylenol #3.  R. 450.  On May 22, Plaintiff indicated to Dr. Thornton that she had received a "steroid shot" in her back, but that she was not receiving other pain medication from that doctor.  R. 449.  She indicated that her back pain fluctuated.  R. 449.

On May 30, 2008, Plaintiff met with Dr. McAdam for a followup appointment.  R. 418.  Plaintiff indicated that the steroid helped "to some degree."  R. 418.  Dr. McAdam recommended a course of physical therapy, and indicated that Plaintiff remained disabled.  R. 418.

On June 10, 2008, Plaintiff underwent a physical therapy evaluation.  R. 396-400.

Plaintiff rated her pain as 9 on scale of 1-10 at the time of the evaluation.  R. 397.  She indicated that she had both high blood pressure and congestive heart failure, but that they were both well-controlled by medication.  R. 396.  She also stated that she had been very active prior to her injury, and that she lifted up to 40-50 pounds despite being on a ten-pound restriction.  R. 397.  After the injury, Plaintiff reported, she walked with a straight cane "off-and-on" for two months when the pain level increases, had greatly restricted activities of daily living, and difficulty sleeping.  R. 397.  Plaintiff indicated that she wanted to avoid surgery, or postpone it for as long as possible, and wanted to exhaust all conservative treatment because she had no one to take care of her nephew or herself if she was incapacitated.  R. 396-98.

On June 27, 2008, Plaintiff met with Dr. McAdam again.  R. 417.  He indicated that she walked with a cane, and that she was "not a whole lot better objectively."  R. 417.  Her examination remained unchanged.  R. 417.  Dr. McAdam diagnosed lumbar herniated nucleus pulposus at L3-4 with persistent back and leg pain, and opined that he did not believe anything other than a surgical solution would be appropriate.  R. 417.

The next day, June 28, 2008, Plaintiff sought emergency room treatment at Sentara CarePlex in Hampton, VA for chest pain, which occurred approximately five to ten minutes before arrival, and numbness, tingling and swelling of her hands, fingers, and feet, which began the day prior.  R. 381, 386.  Plaintiff's lungs, heart, extremities and neurological examinations were all rated within normal limits.  R. 382.  A chest x-ray showed mild cardiomegaly, but no acute infiltrate, pulmonary edema, or pleural effusion and with normal depth of inspiration.  R. 389, 471. Plaintiff was diagnosed with chest pain NOS and sciatica.  R. 388.

On July 7, 2008, Plaintiff was discharged from physical therapy, because she did not make any progress.  R. 406.  Plaintiff met with Dr. McAdam on July 21, 2008, where he noted

an unchanged examination.  R. 416.  Dr. McAdam also indicated that Plaintiff could not proceed with surgery because of problems in her personal life, and recommended a second epidural steroid injection.  R. 416.  He performed the second steroid injection on July 24, 2008.  R. 415.

On August 21, 2008, Plaintiff met with Dr. McAdam again.  R. 414.  Dr. McAdam noted that Plaintiff had been rescheduled for surgery, but that Worker's Compensation was refusing to pay for it.  R. 414.  He indicated in his treatment notes Plaintiff's eagerness to have the surgery, and stated he would continue her on analgesics until she informed him that her insurance issues had been remedied.  R. 414.

On February 12, 2009, Dr. McAdam noted that Plaintiff complained of constant pain in her left arm and tingling in her left hand.  R. 411.  He indicated that her neurological examination was unremarkable, but reviewed a previous MRI indicating severe disease in L3-4. R. 411-13.  He diagnosed lumbar degenerative disc disease with a degenerative spondylosis, recurrent disc herniation L3-4 status post remote surgery, and probable peripheral nerve entrapment in her left upper extremity.  R. 413.  Dr. McAdam also requested an EMG study and indicated Plaintiff's willingness to pursue lumbar fixation surgery.  R. 413.  On September 29, 2009, Plaintiff saw Dr. Thornton again, who indicated Plaintiff had high blood pressure, likely due to back pain.  R. 439.

Dr. McAdam completed a lumbar spine impairment questionnaire on June 17, 2010.  R. 473-79.  On it, he indicated his most recent examination of Plaintiff was May 20, 2010.  R. 473. He reiterated his diagnosis of lumbar herniated nucleus pulposus at L3-4, indicating that the positive clinical findings that supported the diagnosis included a thirty-degree limited range of motion, left paraspinal lumbar tenderness, abnormal gait, sensory loss, changes in the left knee reflex, a positive straight leg raising test on the left, and radicular pain in the L4 root distribution.

R. 473-74.  Dr. McAdam identified a lumbar MRI scan as the main diagnostic or laboratory support for his findings.  R. 474.  He also opined that Plaintiff's symptoms and functional limits were reasonably consistent with Plaintiff's physical impairments.  R. 474.  He also indicated that Plaintiff suffered persistent pain and numbness in her back and left leg, which was precipitated by any activity.  R. 475.

In response to the survey's questions on Plaintiff's ability to work, Dr. McAdam indicated that in an eight-hour day, Plaintiff could sit for four hours and stand for two.  R. 475. He also indicated Plaintiff could not sit continuously, and would have to get up and move around every two hours, for about two hours.  R. 476.  He indicated Plaintiff could lift and carry 5-10 pounds frequently, 10-20 pounds occasionally, and never more than 20 pounds.  R. 476.  On a question phrased "to what degree can your patient tolerate work stress?" he responded that Plaintiff was capable of low stress.  R. 477.  He opined that she would need to take unscheduled breaks at unpredictable intervals approximately every two hours, for ten to fifteen minutes.  R. 478.  He indicated that she would likely have good days and bad days, and that her impairments were ongoing such that he expected them to continue for more than twelve months.  R. 477-78. He also indicated that plaintiff would "do well" with surgical treatment of her back impairment.[4] R. 479.

At Plaintiff's initial hearing with the ALJ, she indicated that she had not seen a cardiologist in "some time."  R. 64.  She also stated that she had not been hospitalized or seen in an emergency room for her heart condition.  R. 64.

After Plaintiff's first hearing, on August 19, 2010, Plaintiff saw Dr. Thornton for back pain.  R. 498.  Dr. Thornton indicated that Plaintiff's back movement was limited in all directions due to pain, and that she had severe paraspinus muscle spasms.  R. 498.  Dr. Thornton

---

[4] Dr. McAdam reiterated these findings in a medical report dated May 25, 2011.  R. 572-74.

9

also opined that Plaintiff's straight leg raising was negative.  R. 498.  She indicated that she believed the pain was likely due to arthritis, found no neurological symptoms, and prescribed Tylenol and a muscle relaxant.  R. 498.

On August 30, 2010, Plaintiff sought emergency room treatment for congestive heart failure exacerbation.  R. 497, 510-527.  She was released early in the morning of August 31, with medication and an instruction to return for a follow up appointment.  R. 512.  Plaintiff was seen by Dr. Thornton on September 15, 2010, and Dr. Thornton referred her to a cardiologist at Medical College of Virginia (MCV) in Richmond.

Plaintiff first visited MCV Nephrology on June 8, 2010, 487-89, and had a cardiac evaluation on October 5, 2010 performed by David W. Richardson, M.D.  R. 568-69.  Plaintiff denied chest pain, dizziness, edema, and syncope, but stated she had shortness of breath and limitations in walking because of her joints.  R. 568.  Dr. Richardson reported that she coughed continuously, and also that Plaintiff stated she smoked less than five cigarettes a day.  R. 568. Plaintiff also indicated that she had not taken her blood pressure medications on that day.  R. 569.  On examination, Dr. Richardson opined that Plaintiff's chest was clear, her cardiac examination revealed a regular rhythm, and her extremities had equal pulses without edema.  R. 569.

On November 1, 2010, Dr. Richardson filled out a cardiac impairment questionnaire.  R. 491-96.  In it, he noted that plaintiff had cardiomyopathy, an ejection fraction of twenty-five percent, and palpitation.  R. 491.  He also indicated she had shortness of breath and fatigue.  R. 491.  As diagnostic support Dr. Richardson indicated the October 5 echocardiogram and a BNP of 924, and indicated that Plaintiff's symptoms were reasonably consistent with her impairment. R. 492.  Regarding Plaintiff's ability to work, Dr. Richardson stated that she could sit for one

hour and could not stand or walk during standard eight-hour workday, and also indicated she would need frequent breaks.  R. 493.  He opined that she could lift and carry five pounds frequently and ten pounds occasionally, but never more than ten pounds.  R. 494.  He checked a box indicating that she would likely have "good days" and "bad days," and that she would likely have to be absent from work more than three times per month.  R. 494.  He also indicated that her pain or other symptoms would interfere with her attention and concentration frequently to constantly, and that she was incapable of even low stress.  R. 494.  He opined she would need to avoid fumes, temperature extremes, and pushing, pulling, kneeling and stooping.  R. 495.  When asked what was the earliest date that the description of symptoms and limitations applied, Dr. Richardson simply wrote, "1996."

### C. Testimony Before the ALJ

At her first administrative hearing on July 21, 2010, Plaintiff testified that she had previously worked as a fire watcher for Davis Boatworks.  R. 63.  She testified that she received Worker's Compensation in a settlement for a lump sum, and was no longer receiving any financial support from Worker's Compensation.  R. 62.  She received approximately $9000, above medical expenses, in approximately April of 2009.  R. 62.

Plaintiff testified that after her back injury, she could only stand for a short period of time and lift ten pounds or less, and could not do the things she used to.  R. 63.  She stated that she used to be able to walk up to two miles a day.  R. 63.  She testified that she took public transportation, because she did not have a car.  R. 63.  She also testified that during the day, she would do housework, such as making beds, cleaning bathrooms, washing the dishes, cooking, and laundry, but she had not been able to do as much as she'd like because of her injury.  R. 65-66, 69.  She stated that she attended church and read her Bible often, but rarely went out with

friends.  R. 66.  She also testified that she has good days and bad days, but out of a week, only two to three days are considered "good" days.  R. 69.

A Vocational Expert (VE) also testified at Plaintiff's hearing.  R. 70-74.  The ALJ asked the VE to consider a hypothetical individual with Plaintiff's vocational factors who could perform light work that would allow the individual to alternate positions sitting and standing periodically, would not require more than occasional postural activities, and would never require climbing or exposure to dust, fumes, odors or gasses.  R. 70.  The VE agreed that the hypothetical individual could not perform any of Plaintiff's past work, but could perform jobs such as unarmed security guard, and cashier.  R. 70-71.

At her second administrative hearing on April 19, 2011, Plaintiff testified about changes since her last administrative hearing.  She testified that now she walks with a cane every day, and although she is able to walk without it if she is not in pain, she takes it wherever she goes because she is rarely not in pain, and her leg gets weak quickly.  R. 35.  She testified that she receives unemployment, and that she looks for light clerical work she could do from home every day.  R. 36.  She stated that since the last hearing, her heart has gotten weaker and she has been unable to receive more epidural steroid injections for her back because she does not have insurance. R. 36-37.  In relation to her heart condition, she indicated that she had palpitations, shortness of breath, and fatigue.  R. 37-38.  She also testified that she no longer helps with any chores other than doing the dishes, but that she still goes to church and takes public transportation.  R. 39.  She testified that she can walk for up to ten to fifteen minutes at a time, and stand for ten to fifteen minutes, if she takes a break in between.  R. 41.  She stated that she spends two to four hours a day lying down on her left side, R. 41, and that she cannot sit still for more than ten to fifteen minutes.  R. 43.  She also indicated that she occasionally gets dizzy, but

that it is a side-effect of the medication.  R. 44.

A VE also testified at Plaintiff's second hearing.  R. 46-54.  The ALJ asked the VE to consider a hypothetical individual with Plaintiff's vocational factors who could perform light work that would allow the individual to alternate positions sitting and standing periodically, would not require more than occasional postural activities, and would never require climbing or exposure to dust, fumes, odors or gasses. R. 46. The ALJ further asked the VE if there would be "light, unskilled work" that such a person could perform. R. 72. The VE testified that such an individual could perform unskilled jobs, specifically cashier, information clerk, and office helper. R. 46-47.  The VE indicated that if the Plaintiff's testimony was taken as true, an individual with the same vocational factors would not be able to perform any work.  R. 47.  On examination by Plaintiff's attorney, the VE also opined that if Dr. McAdam's opinion testimony was given full weight, an individual with the plaintiff's vocational factors would be incapable of performing any work.  R. 74-75.

### III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368

F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law.  *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).

Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law.  *Coffman,* 829 F.2d at 517.

## IV. <u>ANALYSIS</u>

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file applications for DIB and SSI, and be under a "disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other

substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." *Schnetzler v. Astrue*, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. *Hays*, 907 F.2d at 1456.

**A. ALJ's Decision**

On April 25, 2011, following the second administrative hearing, the ALJ made the following findings with respect to Plaintiff. R. 16-24. Plaintiff met the insured status requirements of the Act through March 31, 2013, and Plaintiff had not engaged in substantial gainful activity since February 8, 2008, the alleged onset date of disability. R. 18. Second, Plaintiff suffered from back disorder; asthma; and cardiovascular disease characterized by

congestive heart failure, cardiomegaly, and hypertension; that represent severe impairments. R. 18-19.  Third, Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 19.

After step three, but prior to deciding whether Plaintiff can perform her past relevant work at step four, the ALJ determined Plaintiff's residual functional capacity (RFC).  The ALJ found that Plaintiff has the RFC to perform light work "that allows her to alternate her position between sitting and standing," and that allows her to "avoid more than occasional balancing, kneeling, crouching, stooping, and crawling, excessive exposure to environmental irritants, all climbing, and exposure to heights and hazards." R. 19-20.  In determining Plaintiff's RFC, the ALJ assigned "great weight" to the opinions of the state agency medical reviewers at both the initial and reconsideration determinations, that Plaintiff retained the capacity for light work, reduced by the limitations the ALJ listed, stating that the medical reviewer's opinions were "supported by the absence of acute findings and aggressive treatment." R. 21.  He assigned "no more than minimal to moderate weight" to Dr. McAdam's opinion that Plaintiff was unable to perform any work, citing a supposed inconsistency in Dr. McAdam's statement regarding Plaintiff's ability to work, and the fact that he "identified other limitations that would preclude work but stated that in his opinion, the claimant would do well with surgical treatment." R. 22. The ALJ based this conclusion largely on the Plaintiff's "minimal treatment and the inconsistencies in Dr. McAdam's responses."  R. 22.

Further, the ALJ declared the opinions of Plaintiff to be not credible prior to October 30, 2010. R. 21.  The ALJ opined that the Plaintiff did not report any medication side effects to her treating sources; still performed many daily activities such as attending church, reading the Bible, making beds, cleaning the bathroom, and washing dishes; and did not have follow-up

treatment or evaluations before June 2010, despite a referral to the Medical College of Virginia in Richmond.  R. 21.

At the fourth step, the ALJ found Plaintiff was unable to perform any past relevant work. R. 22.  Prior to the step five analysis, the ALJ found that Plaintiff's age category of "closely approaching advanced age" has not changed since the alleged disability onset date, that she has an eleventh grade limited education, and that after October 30, 2010, Plaintiff has not been able to transfer job skills to other occupations.  R. 22-23.  At step five of the sequential analysis, the ALJ found that, considering the claimant's age, education, work experience and residual functional capacity, before October 30, 2010, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. R. 23.  Beginning on October 30, 2010, considering Plaintiff's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that Plaintiff can perform. R. 24.

**B. Plaintiff Assignments of Error**

In her memorandum in support of summary judgment, Plaintiff alleged the following specific errors: (1) the ALJ failed to follow the treating physician rule and either give controlling weight to Dr. McAdam's opinion or adequately explain why he discounted it; and (2) the ALJ failed to properly evaluate Plaintiff's credibility. Pl.'s Mot. for Sum. J. 8-17, ECF No. 14.

**1. Treating Physician Rule**

Plaintiff asserts the ALJ failed to apply the appropriate legal standards when weighing the medical opinion evidence and failed to weigh Dr. Laster's opinions under any of the factors in 20 C.F.R. § 404.1527 and § 416.927. Pl.'s Mot. for Sum. J. 8-12, ECF No. 14.  Defendant asserts that, with the exception of Dr. McAdam's declaration that Plaintiff must cease working at

her boatyard job for three months in 2008, none of Dr. McAdam's (or Dr. Richardson's) opinions relate his "clinical findings to an inability to work light duty jobs." Def.'s Mem. 18-19, ECF No. 16.   Defendant also argues that the medical findings of both Dr. McAdam and Dr. Richardson may not be objective, because "a physician's opinion may be colored by sympathy for the affected individual," and the ALJ is not bound by "a conclusory medical opinion, and may accord it significantly less weight."   Def.'s Mem. 19, ECF No. 16.   Therefore, according to Defendant, because Dr. McAdam's medical opinion does not contain information on Plaintiff's ability to work and because it may not be objective, substantial evidence supports the ALJ's decision to discount it.   Def. Mem. 19-20, ECF No. 16.

The ALJ assigned minimal to moderate weight to the opinions of Plaintiff's treating neurologist, Dr. McAdam, specifically his June 17, 2010 lumbar spine impairment questionnaire, which opined that Plaintiff had marked limitations in her ability to complete a normal workday. R. 22, 473-80.   The ALJ found that Dr. McAdam's report provided conflicting opinions on Plaintiff's ability to work, namely that it stated she was capable of performing low-stress jobs, but that she is unable to sustain a full-time competitive job.   R. 22.   The ALJ also found that Dr. McAdam identified other limitations besides Plaintiff's back that would preclude her from working (though the ALJ fails to provide any examples of McAdam's other findings), but stated that Plaintiff would "do well with surgical treatment."   R. 22.   The ALJ also found that Plaintiff did not pursue specific treatment for her back at the Richmond teaching hospital, despite seeking treatment there for other maladies.   R. 22.   Because of the minimal treatment that Plaintiff pursued for her back injury and the supposed inconsistencies in Dr. McAdam's report responses, the ALJ assigned Dr. McAdam's conclusions regarding the severity of Plaintiff's limitations minimal to moderate weight. R. 22.

The ALJ failed to address all necessary factors prior to assigning Dr. McAdam's opinion minimal to moderate weight.  The regulations provide that after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC. 20 C.F.R. § 404.1545(a) and § 416.945(a). The RFC is a claimant's maximum ability to work despite her limitations. *Id.* at § 404.1545(a)(1) and § 416.945(a)(1). The ALJ then uses that RFC to determine whether the claimant can perform her past relevant work. *Id.* at § 404.1545(a)(5) and § 416.945(a)(5). The determination of RFC is based on a consideration of all the relevant medical and other evidence in the record. 20 C.F.R. § 404.1545(a)(3) and § 416.945(a)(3).[5]

In making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians. Under the federal regulations and Fourth Circuit case-law, a treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2) and § 416.927(d)(2), *see also Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Conversely, "if [a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. However,

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.

---

[5] "Other evidence" includes statements or reports from the claimant, the claimant's treating, or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptom affect the claimant's ability to work. 20 C.F.R. § 404.1529(a) and § 416.929(a).

SSR 96-2p, 61 Fed. Reg. 34490, 34491 (July 2, 1996).

The regulations require the ALJ to evaluate every medical opinion. Accordingly, even if a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* at *5. Those factors are: (1) "[l]ength of treatment relationship and the frequency of examination;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527(d)(2)-(6) and § 416.927(d)(2)-(6).

Under the applicable regulations, the ALJ is required to explain in his decision the weight assigned to *all* opinions, including treating sources, non-treating sources, State agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(e)(2)(ii) and § 416.927(e)(2)(ii). Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 61 Fed. Reg. 34490, 34492 (July 2, 1996).  This specificity requirement is necessary because the reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d

396, 397 (4th Cir. 1974)).

Dr. McAdam started treating Plaintiff in 2002, when he performed a left lumbar laminectomy, fusion, and removal of a tumor.  R. 61, 462-70.  He began treating Plaintiff for her back strain on April 10, 2008, and the last reported date of treatment with Plaintiff was May 20, 2010.  R. 420, 473.  When Dr. McAdam examined the results of Plaintiff's MRI on April 25, 2008, he recommended an epidural steroid injection, and that Plaintiff remain out of work for at least three months during her treatment.  R. 419.  On May 30, 2008, Dr. McAdam found no changes in Plaintiff's condition, recommended a course of physical therapy, and opined that she remained disabled to work.  R. 418.

On June 27, 2008, Dr. McAdam opined that Plaintiff was "not a whole lot better objectively."  R. 417.  On July 21, 2008, Dr. McAdam noted Plaintiff was dismissed from physical therapy because she was not improving, and that family and personal problems caused Plaintiff to be unable to go forward with surgery at that time, and authorized a second epidural steroid injection, which was performed on July 24, 2008.  R. 415-16.

On August 21, 2008, Dr. McAdam noted that Plaintiff's previously-scheduled surgery had to be cancelled, because Worker's Compensation would not pay for it.  R. 414.  He continued Plaintiff on her medication, and encouraged her to call once insurance issues were straightened out.  R. 414.  He noted that she would like to have the surgery because of intense leg pain.  R. 414.  On February 12, 2009, Dr. McAdam opined that Plaintiff wished to have surgery, and that he would look into scheduling it.  R. 413.  In the treatment notes for all of the above visits, with the exception of the visits on April 25, 2008 and May 30, 2008, Dr. McAdam did not opine on Plaintiff's ability to work.

On June 17, 2010, Dr. McAdam completed a lumbar spine impairment questionnaire,

indicating his most recent examination of Plaintiff was May 20, 2010. R. 473. He reiterated his diagnosis of lumbar herniated nucleus pulposus at L3-4, indicating that the positive clinical findings that supported the diagnosis included a thirty-degree limited range of motion, left paraspinal lumbar tenderness, abnormal gait, sensory loss, changes in the left knee reflex, a positive straight leg raising test on the left, and radicular pain in the L4 root distribution. R. 473-74. Dr. McAdam identified a lumbar MRI scan as the main diagnostic or laboratory support for his findings. R. 474. He also opined that Plaintiff's symptoms and functional limits were reasonably consistent with Plaintiff's physical impairments. R. 474. He also indicated that Plaintiff suffered persistent pain and numbness in her back and left leg, which was precipitated by any activity. R. 475.

In response to the survey's questions on Plaintiff's ability to work, Dr. McAdam indicated that in an eight-hour day, Plaintiff could sit for four hours and stand for two. R. 475. He also indicated Plaintiff could not sit continuously, and would have to get up and move around every two hours, for about two hours. R. 476. He indicated Plaintiff could lift and carry 5-10 pounds frequently, 10-20 pounds occasionally, and never more than 20 pounds. R. 476. On a question phrased "to what degree can your patient tolerate work stress?" he responded that Plaintiff was capable of low stress. R. 477. He opined that she would need to take unscheduled breaks at unpredictable intervals approximately every two hours, for ten to fifteen minutes. R. 478. He indicated that she would likely have good days and bad days, and that her impairments were ongoing such that he expected them to continue for more than twelve months. R. 477-78. He also indicated that plaintiff would "do well" with surgical treatment of her back impairment. R. 479.

The only other opinions in the record regarding Plaintiff's back pain are from the medical

reviewers at the initial and reconsideration determinations, who did not perform any examination of Plaintiff, and reviewed only Plaintiff's medical records.  R. 84-104, 109-34.  The ALJ assigned "significant weight" to these medical reviewers' opinions that Plaintiff's physical impairments did not prevent her from completing light work, reduced by the limitations in the RFC. R. 21.

The ALJ offered two basic reasons for assigning minimal to moderate weight to the findings of Dr. McAdam, that there were inconsistencies in Dr. McAdam's responses to the questionnaire and that Plaintiff did not pursue any more than a minimal course of treatment.  R. 22.  The ALJ specifically cited that Dr. McAdam indicated that Plaintiff could perform low stress work, but also that she could not "sustain a full-time competitive job," and that Dr. McAdam indicated she would do well with surgical treatment, but Plaintiff did not pursue surgical treatment at MCV teaching hospital, despite the fact that she sought treatment there for other ailments.  R. 22.  The inconsistency specifically listed by the ALJ is a false inconsistency; the question Dr. McAdam answered affirmatively was not specifically asking whether the Plaintiff could perform a low-stress job; it was "to what degree can your patient tolerate work stress?"  R. 477.  It is possible to answer affirmatively that Plaintiff can tolerate low work stress, but also find that she cannot complete a normal eight-hour day for other reasons.  Furthermore, while it is true Plaintiff did not pursue more aggressive treatment, there is no evidence she would not have pursued more aggressive treatment if it was available to her.[6]  In fact, the opposite is

---

[6] To the extent the ALJ is referring to SSR 82-59, 45 Fed. Reg. 55566 (Aug. 20, 1980), which states that one cannot be found to be disabled when he or she did not seek prescribed treatment for their alleged disability, this Court finds that ruling inapplicable here. First, the ALJ did not discuss how Plaintiff does not fall under the fifth exception, which allows respite from the rule if one "is unable to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable," *id*; the ALJ merely touched on the fact that Plaintiff sought treatment at a teaching hospital for other ailments, but did not discuss whether this surgery would have been available to Plaintiff for free or reduced cost.  Second, and more importantly, the opinion is intended to be used as proof of disability or not; nothing in the SSR indicates that it is to be used to evaluate the credibility of opinion sources.

true; Dr. McAdam's treatment notes indicate that Plaintiff scheduled back surgery twice, and had to cancel it for various reasons.  R. 414-16.  He also opined several times that she wished to pursue back surgery, and intended to once her insurance situation was more stable.  R. 413-17.

The ALJ did not present any evidence that the findings of Dr. McAdam, Plaintiff's treating physician for her back injury, were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or were "inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2) and § 416.927(d)(2).  Dr. McAdam cited several clinical and laboratory diagnostic findings, including the results of an MRI, to support his opinion in the June 17, 2010 report.  The ALJ did not opine on whether these diagnostic techniques were medically acceptable.  The ALJ also did not discuss whether Dr. McAdam's findings were consistent with the rest of the record, aside from the Plaintiff's lack of pursuit of more aggressive treatment.  The ALJ did not discuss either of the factors required to deny controlling weight to a treating physician's opinion.

Additionally, even if a treating physician's opinion is not entitled to controlling weight, the ALJ must weigh the factors outlined in 20 C.F.R. § 404.1527(d)(1)-(6) and §416.927(d)(2)-(6).  *See Burch v. Apfel*, 9 Fed. App'x 255, 259 (4th Cir. 2001) (per curiam); *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000) (joining other federal courts in requiring the ALJ to consider § 404.1527(d) factors when declining to give controlling weight to the treating physician's opinion, and noting that ALJ should consider factors on remand).  The ALJ failed to address these factors as well when he assigned Dr. McAdam's opinions minimal to moderate weight. Accordingly, the Court is unable to appropriately review the ALJ's decision and determine whether substantial evidence on the record supports that decision.

Upon review, the Court finds that the ALJ made an error of law by not properly

weighing the factors outlined in 20 C.F.R. § 404.1527(c)(1)-(6) and §416.927(c)(1)-(6) prior to assigning Dr. Laster's opinion minimal weight. For this reason, the case should be remanded. *Perales*, 402 U.S. at 390; *Coffman*, 829 F.2d at 517.

## 2. Plaintiff's Credibility Determination

Plaintiff's second assignment of error is based on the ALJ's credibility determination. Pl.'s Mem. 12-15, ECF No. 14.  The RFC determination must incorporate not only impairments supported by objective medical evidence, but also those impairments based on credible complaints made by the claimant. The ALJ uses a two-step analysis in evaluating a claimant's subjective complaints. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably produce the claimant's pain or symptoms. *Id.* In doing so, the ALJ must consider all relevant medical evidence in the record. *Id.*  If the underlying impairment could reasonably be expected to produce the claimant's pain, the ALJ must then evaluate the claimant's statements about the intensity and persistence of the pain, as well as the extent to which it affects the individuals' ability to work. *Id.* at 595. The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's subjective statements. *Id.* at 595-96.

This Court is required to give great deference to the ALJ's credibility determinations. *See e.g.*, *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488-91 (1951). The Fourth Circuit has held that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal citations omitted). This Court's analysis is restricted to

determining whether the ALJ's credibility determination is supported by substantial evidence and whether the ALJ employed the correct legal standard. *Craig*, 76 F.3d at 589.

In this case, Plaintiff claims that the ALJ applied an incorrect standard in finding that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible. Pl.'s Mem. 12-15, ECF No. 14. Plaintiff argues that the ALJ erred by evaluating Plaintiff's statements against the RFC determined by the ALJ, as opposed to the evaluating her statements against the evidence of record. *Id.* Defendant fails to address Plaintiff's argument about applying an incorrect standard, instead focusing on the deference the Court owes to an ALJ's credibility determination. Def.'s Mem. 20-22, ECF No. 16.

In making his credibility determination, the ALJ acknowledged that Plaintiff's impairments could reasonably be expected to cause her alleged symptoms. R. 21. The ALJ then stated that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are *not credible prior to October 30, 2010, to the extent they are inconsistent with the above residual functional capacity assessment.*" *Id.* (emphasis in original).  This final statement of the ALJ appears as boilerplate language in any number of decisions by ALJs throughout the United States. *See e.g., Bjornson v. Astrue*, 671 F.3d 640, 644-645 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). The Seventh Circuit in particular has been critical of the use of this verbiage, going so far as to call it "meaningless boilerplate [language]." *Parker*, 597 F. 3d at 922.

The use of this boilerplate language creates two problems. First, the Regulations instruct the ALJ to evaluate the consistency of a plaintiff's statements against all of the evidence of record, and not against just the ALJ's own RFC assessment. 20 C.F.R. § 404.1529(c)(4) and

§ 416.929(c)(4).  The second problem is that the ALJ's conclusion regarding Plaintiff's credibility may indicate that the ALJ made his RFC determination before taking into account Plaintiff's credibility.  Therefore, the ALJ could not have made his RFC determination using all of the information on the record, because he had not yet made his credibility determination for Plaintiff's statements. *See Bjornson*, 671 F.3d at 645 ("A deeper problem is that the assessment of a claimant's ability to work will often . . . depend[] heavily on the credibility of her statements.").  The Court agrees with the Seventh Circuit that the ALJ stating that the he first made the RFC determination and then made a credibility determination "gets things backwards." *Id.*

Courts in the Eastern and Western districts of Virginia have found the Seventh Circuit's analysis of this issue to be applicable and persuasive. *See Roberts v. Astrue*, No. 1:12cv958, 2013 WL 5322807 at *12 (E.D. Va. Sept. 23, 2013) (Judge O'Grady) (finding the ALJ applied an incorrect legal standard in weighing plaintiff's statements in light of the RFC he had already established); *Little v. Colvin*, No. 2:12cv300, 2013 WL 2489173 (E.D. Va. June 7, 2013) (Judge Jackson) (finding the "boilerplate language calls into question whether the proper decisional process was undertaken by the ALJ in both reaching his RFC determination and evaluating the Plaintiff's credibility" and remanding for clarification); *Duff v. Astrue*, No. 5:11cv103, Dkt. No. 18, at *9 (W.D. Va. Nov. 30, 2012) (PACER) (Judge Welsh) (recommending remand based on the ALJ's use of the boilerplate language because this language allows the ALJ to assume what he wishes to prove).  Courts have also found that use of the boilerplate language does not require remand where an ALJ has sufficiently supported his RFC and credibility determinations. *See Martin v. Colvin*, No. 5:12cv66, 2013 WL 4451230 at *7 (W.D. Va. Aug. 16, 2013) (Judge

Urbanski); *Racey v. Astrue*, 5:12cv36, 2013 WL 589223, at *6 (W.D. Va. Feb. 13, 2013) (Judge Crigler).

To the limited extent that the ALJ discusses Plaintiff's credibility beyond the boilerplate language, the Court does not find his arguments to be persuasive. First, the ALJ indicated that Plaintiff did not report medication side effects to her doctors. R. 21. As Plaintiff has not alleged any disability arising from medication side effects, this finding is irrelevant. The ALJ also opined that Plaintiff attended church, read her Bible, made her bed, cleaned the bathroom, and washed dishes. R. 21. However, the Fourth Circuit has found that the performance of light household activities is not inconsistent with a finding of disability. *Hines v. Barnhart*, 453 F.3d 559, 565-566 (4th Cir. 2006). In *Hines*, the Fourth Circuit found that although a claimant stated that he raked leaves, mowed the lawn, and went to church, the other evidence in the record supported the fact that he did these chores slowly, with many breaks, while in constant pain. *Id*. Simply because a claimant may be able to perform some actions around the house, that does not mean that he or she "ha[s] the capacity to function at any RFC level that requires an eight hour work day or its equivalent on a continual basis." *Id*. at 566. Without further addressing the medical evidence in the record, the ALJ cannot discount Plaintiff's credibility simply because she performs some household duties.

Finally, the ALJ cites that Plaintiff testified she did not seek much medical treatment because she lacked insurance, but she was referred to the Medical College of Virginia in Richmond; he also stated she had transportation to get there, but did not go until June of 2010. R. 21. This should not cut against Plaintiff's credibility; the ALJ cites no information regarding what treatment would be available to her at this hospital, and whether she was eligible for free or reduced price treatment. Furthermore, to the extent to which the ALJ was attempting to

28

reference SSR 82-59, 45 Fed. Reg. 55566 (Aug. 20, 1980) (cited in Footnote 6 above), the SSR is inapplicable to this situation.   Setting aside whether Plaintiff could have received the treatment, SSR 82-59 specifically regards whether the ALJ can *find someone not eligible for benefits* because they failed to pursue treatment, not for evaluating a claimant's credibility.

In the present case, the Court is not comfortable finding that the ALJ considered all of the evidence prior to making an RFC and credibility determination. The boilerplate language provides no evidence to support the ALJ's decision, and the meager facts cited by the ALJ do not support his conclusion.  As outlined above, the Court cannot find the RFC determination in this case was made with full consideration of all the evidence on record. Therefore, it would be illogical for the Court to accept the ALJ's conclusion that Plaintiff's statements are not credible because they are inconsistent with the RFC determination.  Remand is recommended to allow the Commissioner to properly evaluate Plaintiff's statements about her alleged symptoms.

## V.  RECOMMENDATION

For the foregoing reasons, the Court recommends that Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion for Remand (ECF Nos. 12 & 13) be GRANTED to the extent that it seeks remand of the Commissioner's decision and DENIED to the extent that it seeks reversal and an entry of an order directing the award of benefits; the Commissioner's Cross Motion for Summary Judgment (ECF No. 15) be DENIED; and the final decision of the Commissioner be VACATED and REMANDED for further analysis consistent with this Report and Recommendation.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. §  636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208 (1984).

_____/s/_____

Tommy E. Miller
UNITED STATES MAGISTRATE JUDGE

Newport News, Virginia
November 22, 2013